IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. No. 13-cv-02203-BNB

JO AN RICHARDS,

Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of Social Security,

Defendant.

_____

**ORDER**
_____

This action seeks review of the Commissioner's decision denying the plaintiff's claim for supplemental security income benefits under Title XVI and disability insurance benefits under Title II of the Social Security Act.  The court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).  The matter has been fully briefed, obviating the need for oral argument.  The decision is AFFIRMED.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The plaintiff filed her application for benefits on July 11, 2009, stating that she had been disabled due to a lower back injury and bipolar disorder beginning October 31, 2008. *Social Security Administrative Record* [Doc. #10] (the "Record"), pp. 94-121.[1]  Her application was denied. Id. at pp. 135-38.  The plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at p. 139.  The hearing was held on August 16, 2011. Id. at p. 21.  At the hearing,

---

[1] I refer to the official page numbers of the Record which are found on the lower right-hand corner of each page, not to the page numbers that are assigned by the court's docketing system.

the plaintiff amended her alleged onset date of disability from October 2008 to January 25, 2010. Id. On September 9, 2011, the ALJ issued a written decision finding that the plaintiff was not disabled as defined in the Social Security Act. Id. at pp. 21-31. The Appeals Council denied the plaintiff's request for review. Id. at p. 1. The ALJ's decision is final for purposes of this court's review. 20 C.F.R. § 404.981.[2]

The plaintiff was 52 years old at the time of the hearing. Id. at p. 41. In October 2004, she had an MRI of her lumbar spine after suffering a lifting injury at work. Id. at p. 331. The MRI revealed a focal far left-sided disc protrusion of the L3-4 at the level of the foramen with associated annular tear; a focal lateral right-sided protrusion of the L4-5 at the level of the foramen with annular tear and minor foraminal encroachment; and a minimal disc bulge at L5-S1. Id. at pp. 131-32.

In July 2005, a workers' compensation physician, John Nordin, M.D., found that the plaintiff could lift a maximum weight of 10 pounds, carry five pounds, walk for three hours per day, and stand for four hours per day. Id. at p. 328.

On January 27, 2006, the plaintiff saw Physical Therapist Patrick Coughlan for an evaluation of her potential to return to work. Id. at pp. 406-21. The plaintiff reported that she felt improvement with her pain after work conditioning and that she would like to continue exercising to improve her strength and lose weight. Id. at p. 409. After extensive testing, Mr. Coughlan found that the plaintiff's work tolerance was consistent with light work. Id. at p. 408.

---

[2]All references to the Code of Federal Regulations are to the 2013 edition of part 404, which addresses claims under Title II of the Act. All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

On June 15, 2006, the plaintiff was diagnosed with lumbar sprain and strain by Dr. Hemler at Sports and Orthopedic Rehabilitation. He referred her to the Denver West Surgery Center for a sacroiliac joint injection and facet block. Id. at pp. 326-27.

On May 12, 2008, the plaintiff was seen by Physician's Assistant Darcy Connelly for "bipolar illness." Id. at p. 321. PA Connelly documented that this was the plaintiff's initial visit; the plaintiff's severity level was 2; the problem was worsening; the plaintiff was working 20 hours a week; she didn't like her job; and she believed her medication was not working any more. The plaintiff was alert, cooperative, and in no apparent distress. Her listed problems/conditions included opioid dependence, depressive disorder, and obesity. PA Connelly documented that the plaintiff had used lithium in the past with adverse drug reactions; she was without insurance; and she could not afford other mood stabilizers. PA Connelly increased the plaintiff's Symbyax to the maximum dosage. Id.

On July 14, 2008, the plaintiff was seen by PA Connelly for a "bipolar [follow up]" visit. Id. at p. 319. PA Connelly documented that the severity level was mild; the problem was improving; the plaintiff was off all narcotics after methadone treatment; her mood seemed better; the plaintiff wanted to stay on Symbyax; and the plaintiff thought that the Symbyax was working better now that she was off narcotics. PA Connelly found that the plaintiff was alert, cooperative, in no apparent distress, had normal affect, and was cooperative. Her listed problems/conditions included opioid dependence, depressive disorder, and obesity. Id.

On June 10, 2009, the plaintiff visited the Arvada Clinic as a new patient complaining of right knee pain. Id. at p. 370. She was seen by Arti Saproo, M.D. Id. Dr. Saproo noted that the plaintiff was alert and cooperative, had a normal mood and affect, and a normal attention span

and concentration.  Id. at p. 372.  Dr. Sparoo listed chronic back pain as one of the plaintiff's problems.  The doctor's recommended treatment included diet, exercise, cold compresses, and Naproxen twice a day.  Id.

On June 21, 2009, the plaintiff was seen at the University of Colorado Hospital Emergency Room for right-sided back pain.  Id. at p. 323.  She arrived with a steady gait, walked normally, appeared comfortable, and did not appear to be in acute distress.  She had tenderness in the right mid-back area and pain with straight leg raise.  Id. at p. 341.  Her CT scan and blood tests were normal.  She was diagnosed with a strained muscle.  She was treated with oxycodone and diazepam and experienced "some improvement" with that treatment.  She was told to return to the Emergency Room if her pain worsened and to follow up with her primary care physician within three to five days.  Id. at pp. 323-24.

On September 15, 2009, the plaintiff saw Jonathan Lipson, Ph.D., for a consultative psychiatric evaluation for Social Security Disability determination.  Id. at pp. 352-358.  The plaintiff claimed that she had bipolar disorder that was diagnosed in 2005, and a lower back injury that occurred in 2004.  Id. at p. 352.  She claimed that she did not answer the telephone, did not visit with her friends or parents, and no longer sang or played the guitar; however, she visited with her grandchildren and "acknowledged that she love[d] to visit with them."  Id. at p. 354.  The plaintiff lived with her partner and her dogs and was able to clean the garage (where the dogs stay), dust, and load and unload the dishwasher.  Id. at pp. 353-54.  She was currently employed as an auditor for King Soopers 12 hours per week but had been paid for 36 hours the previous week because she had traveled for work.  Id. at p. 353.

Dr. Lipson found that the plaintiff was cooperative, though irritable during the examination; her organization of thought was logical; her eye contact was appropriate; and her mood was variably pleasant and irritable. Id. at pp. 354-55. Dr. Lipson also found that the plaintiff's immediate and recent memory were adequate, her remote memory and attention were intact, her concentration was fair, her thought processes were concrete, and her judgment and reasoning were fair. Id. at pp. 355-56.

Dr. Lipson documented that the plaintiff's ability to obtain productive employment without assistance is moderately impaired; her ability to perform activities with a schedule, maintain attendance, and be punctual is moderately impaired; her ability to maintain employment, adapt to the work environment, tolerate the stressors of the work environment, and complete a normal work day is markedly impaired; and her ability to manage money or benefits is moderately impaired. Id. at p. 357.

Dr. Lipson did not diagnose the plaintiff with bipolar disorder; instead, he diagnosed chronic posttraumatic stress disorder and stated that the plaintiff "presented with history and symptoms consistent with posttraumatic stress subsequent to childhood sexual abuse." Id. at p. 356. He also stated that she "reported chronic back and leg pain, though the severity of such report may have been exaggerated," id., and that she "presented as a generally reliable historian, but she appeared to exaggerate her pain report." He documented that the plaintiff did not exhibit any pain behavior during the hour-long evaluation. Id. at p. 354.

On November 20, 2009, the plaintiff saw Dr. Charlene Borja at Disability Exam Services for a consultative exam. Id. at p. 360. The plaintiff reported that she had back pain since 2004

that was exacerbated by bending and vacuuming and alleviated by heat, ice, rest, and no heavy lifting. She further reported that she was diagnosed with bipolar disorder in 2006. Id.

The plaintiff told Dr. Borja that she is able to drive, get in and out of bed, dress herself, bathe herself, and cook and clean for herself. She stated that a typical day is spent doing her part-time job, watching television, reading, and playing guitar. Dr. Borja found the plaintiff to be appropriate during the examination. Id. at p. 361. He stated that she was able to walk in and out of the examination room and get on and off the examination table with mild discernable discomfort. Id. at pp. 361-62. Her gait was not ataxic or antalgic, and she was able to stand and walk on her heels and toes. Id. at p. 363. He noted that her diagnosis of bipolar/anger was questionable. He found that she could stand or walk four hours during a normal eight hour workday; she could sit for eight hours during a normal eight hour workday; she could lift and carry up to 10 pounds; and that workplace environmental limitations include heights and stairs. Id. at p. 364.

Also on November 20, 2009, Ellen Ryan, M.D., reviewed the plaintiff's medical records and determined that the plaintiff could perform low level semi-skilled work if her interaction with supervisors and co-workers was not frequent or prolonged and she had less interaction with the public. Id. at pp. 103-105.

On August 30, 2010, the plaintiff was seen for a wellness exam and right arm pain by Physician's Assistant Ruth Knight at the Arvada Clinic. Id. at pp. 375-82. She was found to be alert and cooperative with a normal mood and affect and a normal attention span and concentration. Id. at p. 378. She received prescriptions for Vicodin and Naproxen. Id. at p. 380.

On September 15, 2010, the plaintiff was seen by Physician's Assistant Karl Olsen at the Arvada Clinic for a follow up appointment. Id. at pp. 388-90. PA Olsen noted that the plaintiff had not been treated for bipolar disorder for approximately three years "[because] of cost." Id. at p. 389. The plaintiff reported that she had been feeling alternately depressed and manic and that her right arm pain was minimally improved. PA Olsen reported that she cried occasionally when discussing her mood problems; she was alert; she climbed to the examination table easily without assistance; had a normal gate; answered questions appropriately; and did not have ataxia. Id. at p. 389. He ordered counseling services for her bipolar disorder; continued the Vicodin; and ordered Symbyax. Id. at pp. 389-90.

On September 27, 2010, the plaintiff saw Dr. Robert Kawasaki. Id. at pp. 367-69. He reported that the plaintiff had a flare-up of back pain on January 25, 2010, when she was stocking shelves at work and fell from a ladder and that she had chiropractic treatments and physical therapy with no significant benefit. She reported continued low back pain which was worse in the mornings after lying in bed and better after moving about during the day. Id. at p. 367. She reported that her pain level was 6/10. She was pleasant, cooperative, and in no acute distress. She walked normally and had diffuse tenderness to the touch in the lower lumbar segments. Dr. Kawasaki stated that the plaintiff had an MRI of the lumbar spine on April 29, 2010, which showed an L4-5 disc bulge with desiccation and minimal degenerative changes at L5-S1 without spinal canal stenosis. She was diagnosed with a lumbar strain injury and was determined to be at maximum medical improvement. Id. at p. 368. Dr. Kawasaki assigned the plaintiff an impairment rating of 14% based on the 2010 back injury. He noted that she was currently working with a light duty status. He recommended 40 pound maximum lifting,

pushing, and pulling occasionally; 20 pounds frequently; and 10 pounds constantly. He further recommended no repetitive bending or twisting to the lumbar spine. He stated that the plaintiff was being seen for opioid medication management; she needed to sign an opioid agreement; and she needed "appropriate opioid management including intermittent blood labs approximately once a year, random urine toxicology screening once to twice a year," and follow up appointments every three months while on the pain medications. Id. at p. 369.

On February 21, 2011, the plaintiff saw PA Ruth Knight at the Arvada Clinic for shoulder and back pain. Id. at pp. 394-97. The plaintiff complained of an aching back pain with an intensity of 6. Id. at p. 394. She also complained of right shoulder pain from a fall in September 2010. Id. at p. 395. PA Knight documented that the plaintiff was not in acute distress; was alert and cooperative; had normal mood and affect; and had a normal attention span and concentration. Id. at pp. 395-96. Her examination revealed a palpable spasm of lumbar paraspinous B with straightening of lumbar lordosis. She was prescribed Vicodin, Celebrex, and Flexaril for her back and Symbyex for bipolar disorder. Id. at p. 396.

On March 8, 2011, the plaintiff was seen by PA Knight for symptoms of a cold and follow up for her back and shoulder pain. Id. at pp. 398-401. Her shoulder pain was fully resolved. Her back was improved but she was "still having lots of spasm." The pain had worsened because she was coughing. Id. at p. 398. PA Knight noted that the plaintiff had an MRI and x-rays through Workers' Compensation in September; was diagnosed with an annular disc tear after falling from a ladder; surgery was recommended; and the plaintiff had settled with Workers' Compensation. Id. at p. 399. PA Knight stated that the plaintiff was not in any acute distress; was alert and cooperative with a normal mood and affect; and had a normal attention

span and concentration. Id. at pp. 399-400. She was prescribed Hydrocodone, Celebrex, and Methocarbamel for her back pain. Id. at p. 400.

On June 17, 2011, the plaintiff was seen by Dr. Justin Hauxwell at the Arvada Clinic for back pain and medication refill. Id. at pp. 402-404. He noted that the plaintiff was leaving for her son's wedding in Florida and would not be back until June 28th. Id. at p. 402. Upon examination, Dr. Hauxwell noted that the plaintiff had a palpable spasm of the lumbar paraspinals B and mild central TTP at L4-L5. Id. at p. 403. He stated that the plaintiff had filled prescriptions written by PA Knight within the past few months, but had filled numerous prescriptions from numerous providers "many much too early" and "in the not-so-distant past." He documented that the plaintiff had difficulty explaining the discrepancy between what she told him about her use of Vicodin and the "filling history documented in the PDMP." He refilled her previous prescriptions but suggested that her primary care physician review the PDMP records to assess the plaintiff's pattern of prescription filling. Id. at p. 403.

At the ALJ hearing, the plaintiff testified that she had been working for a company called Crossmark fairly regularly until she was injured after falling backward from a ladder on January 25, 2010. Id. at pp. 43-51. She filed a Workers' Compensation claim and settled that claim in early 2011. Id. at p. 51. She was treated by a company doctor, Dr. Kawasaki, during her claim. Id. at p. 52. She named PA Knight as her primary care physician. Id. She has not been treated by a mental health care worker because she cannot afford it. Id. at p. 54. She was on mental health medications from 2006 until 2008, then started taking them again in January 2011. Id. at p. 57. Her back has hurt since she first injured it in 2004, but the pain got worse after she fell off the ladder in 2010. Id. at p. 58. She has a hard time bending over to pick up things; she is up all

9

night long with the pain; and she gets no relief from the pain. Id. at p. 59. She stated that she cannot concentrate; she does not "get along with people"; she has trouble remembering; she can only cook simple things; she does not do the dishes, grocery shopping, cleaning, or yard work; and she only goes out once in awhile when she makes herself visit her grandchildren. Id. at pp. 62-64. Activity, walking, and cold weather increase her pain. Id. at p. 65. She can sit for 45 minutes to an hour and can stand for half-an-hour four or five times during an eight hour day. Id. She keeps the television on "for noise," but it does not keep her attention because her mind wanders "so badly." She testified that she has not played her guitar for three years, but she reads. She does not find enjoyment "in a lot of things except for her grandchildren." Id. at pp. 67-68.

She was put on light duty at Crossmark after she fell off the ladder. She worked 9-10 hours per week. She quit Crossmark four months before the hearing because she "just couldn't do it" anymore. She could not sit in a car and could not drive from store to store and "just had to quit." Id. at pp. 61, 71. She has not looked for work since she quit Crossmark because she cannot work with people any more. Id. at p. 72.

## II.  STANDARD OF REVIEW

Review of the Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence. Hamilton v. Secretary of Health and Human Services, 961 F.2d 1495, 1497-98 (10th Cir. 1992); Brown v. Sullivan, 912 F.2d 1194, 1196 (10th Cir. 1990). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. Brown, 912 F.2d at 1196. It requires more than a scintilla but less than a preponderance of the evidence.

Hedstrom v. Sullivan, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993). Although a reviewing court should meticulously examine the record, it may not reweigh the evidence or substitute its discretion for that of the Commissioner. Id.

### III. THE LAW

A person is disabled within the meaning of the Social Security Act only if his physical and mental impairments preclude him from performing both his previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2). "When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination." Campbell v. Bowen, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)). However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Social Security Act. To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months. See Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled:

1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the medical findings.

2. The ALJ must then determine whether the claimed impairment is "severe." A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

3. The ALJ must then determine if the impairment meets or medically equals in severity certain impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant has the residual functional capacity ("RFC") to perform his past work despite any limitations.

5. If the claimant does not have the RFC to perform his past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and RFC.

20 C.F.R. §§ 404.1520(a)-(f). See also Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988).

The claimant has the initial burden of establishing a disability in the first four steps of this analysis. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). The burden then shifts to the Commissioner to show that the claimant is capable of performing work in the national economy. Id. A finding at any point in the five-step review either that the claimant is disabled or not is

conclusive and terminates the analysis. Casias v. Secretary of Health & Human Services, 933 F.2d 799, 801 (10th Cir. 1991).

## IV.  ANALYSIS

The ALJ found that (1) the plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012; (2) the plaintiff has not engaged in substantial gainful activity since January 25, 2010 (the alleged onset date); (3) the plaintiff has the following severe impairments: obesity, lumbar spine disorder, and posttraumatic stress disorder; (4) the plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1; (5) the plaintiff has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that she (a) should avoid repetitive bending and twisting of the back; (b) can stand for four out of eight hours; (c) should avoid all exposure to unprotected heights, climbing ladders, scaffolds, and ropes; (d) can have non-intense interaction with co-workers; and (e) can have non-intense, incidental interaction with the public on an occasional basis; (6) the plaintiff is unable to perform any past relevant work; (7) considering the plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform; and (8) the plaintiff has not been under a disability as defined in the Social Security Act from January 25, 2010, through the date of the ALJ's decision.

The plaintiff claims that (1) the ALJ's evaluation of the medical opinions was based on the wrong legal standard and is not supported by substantial evidence; and (2) the ALJ's RFC assessment was based on the wrong legal standard and is not supported by substantial evidence.

### A. Medical Opinions

The plaintiff argues that the ALJ erred because he improperly gave more weight to the findings of Dr. Ryan, the State Agency psychological examiner, than he gave to the findings of Dr. Lipson, a consultative examiner. "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *7.[3]

The plaintiff argues that "the ALJ stated that he was relying more strongly on the State Agency examiner's opinion than on consultative medical examiner Dr. Lipson's opinion because 'it is inconsistent with the examination results, which showed that the claimant displayed exaggeration behaviors . . . .'" The plaintiff argues that the only exaggeration Dr. Lipson noted was related to the plaintiff's descriptions of her physical pain; Dr. Lipson is not a medical doctor and did not perform a physical examination of the plaintiff; his assessment of her pain is not central to his opinion or his expertise; and therefore his assessment of her pain is not relevant to his findings about her mental health limitations. *Plaintiff's Opening Brief* [Doc. #16], p. 18.

The plaintiff misstates the record. The ALJ explained that he assigned little weight to Dr. Lipson's opinion with regard to the plaintiff's ability to perform work-related activity because (1) it was inconsistent with the examination results which showed that the plaintiff displayed exaggeration behaviors, had only slightly reduced recall, had intact attention, and had fair

---

[3]Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding precedent upon ALJs. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

concentration; (2) the plaintiff reported significant activities of daily living and was working a part-time job at the time of the evaluation; and (3) the plaintiff's failure to obtain psychological treatment and her lack of medication use did not support Dr. Lipson's opinion.  The ALJ stated that he assigned greater weight to Dr. Ryan because she reviewed the entire record, and she noted that although the plaintiff alleged a disability due to bipolar disorder, the medical evidence lacked that diagnosis by an acceptable medical source.  *Record*, p. 28.  The record supports the ALJ's explanation.  Id. at pp. 99; 352-358; 375-82.  *See also* SSR 06-03p, 2006 WL 2329939 at *1-2 (the existence of a medically determinable impairment must be made with evidence from an acceptable medical source; acceptable medical sources are licensed physicians and licensed or certified psychologists).

The plaintiff also argues that the ALJ erred because he failed to consider the medical opinion of Dr. Nordin, "whose conclusions directly contradict the ALJ's residual functional capacity assessment."  *Plaintiff's Opening Brief*, pp. 18-19.  Contrary to the plaintiff's argument, the ALJ cited Dr. Nordin's treatment notes and stated that "[i]n July of 2005 the claimant was restricted to lifting no more than 10 pounds, walking for 3 hours a day, and standing for 4 hours a day.  However, per the claimant's testimony, up until her alleged date of onset in 2010, she was performing a job which required her to lift up to 60 pounds and travel for work."  *Record*, p. 27.  Thus, the ALJ considered Dr. Nordin's opinion.  Moreover, Dr. Nordin's opinion addresses restrictions and limitations for the plaintiff after her 2004 injury.  The relevance of his opinion is limited in view of the plaintiff's alleged disability date and subsequent injury on January 25, 2010; the plaintiff's own testimony; and the medical records and opinions that were generated closer to the alleged onset date and differ from Dr. Nordin's opinion.  *Record*, pp. 36-93; 360-

365; 103-105; 367-69; Webster v. Chater, 96 F.3d 1454, 1996 WL 494315, at *2 (10th Cir. Aug. 29, 1996) (finding that medical evidence predating the alleged onset date had less probative value with respect to whether the plaintiff was disabled than the later medical evidence).

### B. The RFC Assessment

The plaintiff argues that the ALJ erred in his assessment of the plaintiff's credibility. *Plaintiff's Opening Brief*, pp. 19-21.

"[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96–7p, 1996 WL 374186 at *2. In addition to the objective medical evidence, the ALJ must consider other factors when assessing the credibility of an individual's statements, including:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *3.

Here, the ALJ found that the plaintiff was not fully credible. *Record*, p. 26. "In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible." SSR 96–7p, 1996 WL 374186, at *4.

The plaintiff first argues that the ALJ improperly discounted the plaintiff's credibility based on her pecuniary interest in the case. *Plaintiff's Opening Brief*, p. 19. The ALJ stated that one factor he considers in assessing the credibility of any witness is whether the witness has a pecuniary interest in the outcome of the matter in dispute. He found that the claimant has a pecuniary interest in the outcome of the case, but he did not discount any particular testimony or evidence based on pecuniary interest. *Record*, p. 26. Therefore, I do not find any error in the ALJ's statement.

The plaintiff next argues (in a single paragraph) that the ALJ improperly discounted her credibility "on the basis of what he perceived to be inconsistencies between her application documents and her testimony at the hearing." *Plaintiff's Opening Brief*, p. 19. The ALJ found numerous instances where the plaintiff's evidence was inconsistent with or contradicted by other

17

evidence in the record. *Record*, pp. 26-28. The plaintiff does not cite any specific instance. It is not the court's responsibility to search the ALJ's decision for examples which support the plaintiff's argument. See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995). Instead, a litigant must provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence. Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).

Next, the plaintiff argues that the ALJ erred in perceiving an inconsistency between the plaintiff's daily activities and her statements regarding her impairments because "occasionally microwaving prepared food or making other simple dishes is not inconsistent with the plaintiff's reports regarding her pain and mental health limitations." *Plaintiff's Opening Brief*, p. 20. The plaintiff appears to be referring to the ALJ's statement that the plaintiff "has provided multiple inconsistent statements regarding her ability to cook. Initially she reported that she is able to only cook 'simple stuff' without limitations (Ex. 5E/2; 6F/2). The claimant has also stated that she cooks at night, at other times stating she does not like to cook anymore, and at other times she has reported cooking 2 to 3 times a week (Ex. 5E/2; 7E/2,3)." *Record*, p. 26. The ALJ is required to assess the plaintiff's daily activities when determining credibility, SSR 96–7p, 1996 WL 374186 at *3, and the record supports the ALJ's finding. Id. at pp. 266; 361; 275-76. I find no error in the ALJ's statement.

Finally, the plaintiff argues that the ALJ erred by not including the plaintiff's bipolar disorder in the RFC assessment and list of severe impairments because the plaintiff "consistently discussed her bipolar disorder with health care providers throughout the period covered by the record, and has been prescribed mental health medication." *Plaintiff's Opening Brief*, p. 20.

"The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments." SSR 96-8p, 1996 WL 374184, at *1. The existence of a medically determinable impairment must be made with evidence from an acceptable medical source. Acceptable medical sources include licensed physicians and licensed or certified psychologists. Physician assistants are not acceptable medical sources. SSR 06-03p, 2006 WL 2329939, at *1-2.

The record does not contain any evidence from an acceptable medical source that states the plaintiff suffers from bipolar disorder. To the contrary, the record contains medical records reflecting treatment for bipolar disorder from physician assistants. The record contains the opinion of one licensed psychologist, Dr. Lipson. Dr. Lipson noted that the plaintiff self-reported a history of bipolar disorder, but he diagnosed her with posttraumatic stress disorder, not bipolar disorder.

## V. CONCLUSION

I have reviewed the entire record, and I find that the ALJ applied the correct legal standards and that his decision is supported by substantial evidence in the record. I find no error in the ALJ's decision.

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

Dated December 2, 2014.

                                                  BY THE COURT:

                                                  s/ Boyd N. Boland
                                                  United States Magistrate Judge